**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| JULIET GENIVIVA, by and through her parents and next friends, Albert Geniviva and Janice Geniviva, ALBERT GENIVIVA, and JANICE GENIVIVA,<br><br>Plaintiff,<br><br>vs.<br><br>HAMPTON TOWNSHIP SCHOOL DISTRICT,<br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No. 17-351<br><br>Magistrate Judge Robert C. Mitchell |

**OPINION**

Presently before this Court are cross-motions for judgment on the pleadings and/or judgment on the administrative record filed by defendant Hampton Township School District (the District), and plaintiffs Albert Geniviva and Janice Geniviva, on behalf of their daughter, Juliet Geniviva (collectively, the Genivivas). (ECF Nos. 22, 25). The motions address the Genivivas' appeal from the December 20, 2016 decision issued by Pennsylvania Special Education Hearing Officer Cathy A. Skidmore, M. Ed., J.D. (Hearing Officer) in the underlying due process litigation brought by the Genivivas pursuant to the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. §§ 1400-82. (ECF No. 1). The parties ask this Court to consider (1) whether the hearing officer erred in determining that the District's proposed Individualized Education Program (IEP) provided Juliet with a free appropriate public education (FAPE) in the least restrictive environment; (2) whether Juliet's subsequent placement in the St. Anthony School Program (the Program) for the 2016-17 school year was appropriate; and (3) whether, pursuant to 20 U.S.C. § 1412 (a)(10)(C), the Genivivas are entitled to reimbursement from the District for tuition and other expenses related to Juliet's private school placement. For the reasons that follow, this Court

will grant the District's motion, deny the Genivivas' motion, and affirm the decision of the Hearing Officer.

**Factual and Procedural History**

Juliet is a twenty-one-year-old woman with Down Syndrome and an expressive language disorder who resides in the District. (ECF No. 27 ¶ 1; ECF No. 28-1 at 2). From 2012 until 2016, Juliet attended high school in the District. (ECF No. 28-1 at 2). As a student with an intellectual disability, Juliet was entitled to services pursuant to the IDEA. (ECF No. 27 ¶ 2). Each year, as required by the IDEA, an IEP was developed for Juliet. (ECF No. 28-1 at 4, ¶¶ 7-23). Throughout her high school career, the Genivivas disagreed with the IEPs proposed by the District. (Id.) Specifically, the Genivivas sought to focus Juliet's IEP on her academic goals, speech/language, and social skills, as opposed to the functional or vocational life skills recommended by the District. (ECF No. 28-1 at 4, ¶ 6). Ultimately, following a number of challenges to the District's recommendations, for the academic years from 2012 until her graduation in the spring of 2016, Juliet's IEPs reflected the wishes of her parents and limited her life skills and vocational programming while emphasizing traditional academics. (Id.) Under the IDEA, Juliet remained eligible for special education services in the District following her high school graduation. (ECF No. 27 ¶ 2, 4; ECF No. 28-1 at 2).

The 2016-17 Proposed IEP

On May 6, 2016, the District held an IEP team meeting regarding the program developed for Juliet for the upcoming 2016-17 school year. The meeting included a discussion of transition planning and transition services to help develop Juliet's post-secondary goals. (ECF No. 27 ¶ 5;

ECF No. 28-1 at 6, ¶ 24; ECF No. 28-1, Ex. J-10, pg. 4). Present at the meeting were Juliet and Janice Geniviva, numerous District representatives, including the school principal, the assistant principal, and various teachers, a representative from the Office of Vocational Rehabilitation (OVR), and a Geniviva family friend. (ECF No. 28-1, Ex. J-10, pg. 2). While the Genivivas agreed with the IEP's stated goals of transition planning, they expressed concern regarding multiple aspects of the District's proposal, including the time Juliet would spend within a traditional classroom setting, what they perceived as a limited amount of community-based instruction, and the alleged lack of age-appropriate peers and activities available in the District. (ECF No. 28-1, ¶ 45). Instead, the Genivivas contended that Juliet's needs would be better served by enrollment in the Program, which is outside of the District. (Id. at ¶ 42, 45).

The Program

> The Program is located on [Duquesne University's] campus. All students in the Program are ages 18-21 and commute to campus daily.
>
> The Program provides a curriculum that is focused on functional academic skill, vocational training, mobility training and public transportation, and social skills.
>
> Program students attend classes attended only by Program students, although there are two groups of newer and older students who attend separate classes.
>
> There are approximately thirty[-]two students within the Program. Students are placed into small groups for the majority of activities, which include work-experiences and community outings on and near campus. There is also a dedicated apartment for students in Program to visit in order to learn and practice independent living skills such as cooking and laundry.
>
> Approximately twenty university students participate in the Program as a form of their own work-study experience, acting as a job coach and peer mentor. The university mentors support the students who are enrolled in the Program, and assist them in navigating the campus and performing tasks on and off campus.

***

> An organization supported by the Program assigns a "buddy" to interested participants, where a university student is paired with the Program student. Various activities on- and off-campus are available for the university and Program students to attend together.

(ECF No. 28-1, ¶¶ 47-51, 53) (internal citations omitted).

The 2016-17 School Year

At some point prior to the May 2016 IEP meeting, the Genivivas began researching the Program as a possible placement for Juliet for the upcoming school year. (N.T, 11/16-17/2016, at 95). The Genivivas' desire to enroll Juliet in the Program was memorialized in an email sent to the District before the May IEP meeting. (Id. at 455-57). At the conclusion of the May IEP meeting, the Genivivas again expressed to the District their interest in enrolling Juliet in the Program. (Id. at 155-56).

On June 29, 2016, the Genivivas filed their Due Process Complaint challenging the District's proposed IEP. (ECF No. 28-1, ¶ 42). On August 5, 2016, the Genivivas notified the District of their intention to enroll Juliet in the Program and to seek reimbursement of tuition and transportation expenses from the District. (N.T., 11/16-17/2016, at 97, 104). The Genivivas filed an Amended Due Process Complaint on August 22, 2016. (ECF No. 28-1, ¶ 54). Juliet began attending the Program at the end of August 2016. (Id. at ¶ 55). The Genivivas paid Juliet's 2016-17 tuition in full in late September of 2016. (Id. at 54).

The Due Process Hearing

On November 16-17, 2016, during Juliet's first semester in the Program, a hearing was held regarding the Genivivas' due process complaint. (ECF No. 28-1; N.T, 11/16-17/2016).

Through their witnesses, including an expert in the field of special education transition programming, the Genivivas sought to establish that the District's proposed program failed to provide FAPE in the least restrictive environment to Juliet for the 2016-17 school year, particularly with respect to post-secondary transition services. The District maintained that the proposed May 2016 IEP, was appropriate for Juliet under the law and responsive to her needs, thus no remedy was warranted. (Id.) On December 20, 2016, the Hearing Officer issued a Memorandum and Order finding that the District's proposed IEP was appropriate and denying the Genivivas' request for relief. (ECF No. 28-1, pg. 22).

On March 20, 2017, the Genivivas filed a complaint against the District, appealing the Hearing Officer's decision. (ECF No. 1). The District filed its answer on May 26, 2017. (ECF No. 6). On March 15, 2018, the District filed its motion for judgment on the pleadings (ECF No. 22), along with a brief in support thereof. (ECF No. 23). In response, the Genivivas filed a motion for judgment on the administrative record and accompanying brief. (ECF Nos. 25, 26). Both motions have been fully briefed and a ripe for review.

In their motion and brief, the Genivivas claim that the Hearing Officer erred in determining that the District's proposed IEP for the 2016-17 school year was appropriate; thus, it was error to deny their request for tuition reimbursement. (ECF No. 26, pg. 7-25). In its motion and brief, the District asks this Court to affirm the factual findings and legal conclusions of the Hearing Officer, arguing that the IEP offered for Juliet's 2016-17 academic year met the requirements of the IDEA. (ECF No. 23).

This Court has jurisdiction pursuant to 20 U.S.C. § 1415(i)(3)(A) and 28 U.S.C. § 1331. The parties have consented to proceed before the undersigned pursuant to 28 U.S.C. § 636(c) (ECF No. 9).

**Standard of Review**

"Any party aggrieved by the findings and decision" made in the administrative proceeding "shall have the right to bring a civil action" in federal court. 20 U.S.C. § 1415(i)(2)(A). The district court shall review the record of the administrative proceedings, shall hear additional relevant, non-cumulative and useful evidence at the request of a party, and, based on a preponderance of the evidence, grant such relief as it deems appropriate. 20 U.S.C. § 1415(i)(2)(C); Susan N. v. Wilson Sch. Dist., 70 F.3d 751, 760 (3d Cir. 1995).

The district court must give "due weight" to the hearing officer's decision. Board of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cty. v. Rowley, 458 U.S. 176, 205-06 (1982). This requires a district court to conduct a "modified de novo review" of the administrative proceedings. Shore Reg. High Sch. Bd. of Educ. v. P.S., 381 F.3d 194, 199 (3d Cir. 2004); S.H. v. State-Operated Sch. Dist. of the City of Newark, 336 F.3d 260, 270 (3d Cir. 2003). A district court reviewing an administrative fact-finder's conclusions must defer to such factual findings unless the court identifies contrary, non-testimonial evidence in the record, or explains why the record, read in its entirety, compels a different conclusion. S.H., 336 F.3d at 270. However, the district court's review of a hearing officer's application of legal standards and conclusions of law requires no deference to the administrative hearing officer's legal determinations; rather, the legal determinations are subject to plenary review. Id. at 271; Warren G. v. Cumberland Cnty. Sch. Dist., 190 F.3d 80, 83 (3d Cir. 1999). Finally, "the party challenging the administrative decision [with respect to an appeal brought pursuant to the IDEA] bears the burden of persuasion before the district court as to each claim challenged." M.R., 680 F.3d at 270 (internal citations omitted).

**Discussion**

At issue here is the Hearing Officer's determination that the District's proposed IEP offered Juliet a FAPE and the subsequent denial of the Genivivas request for tuition reimbursement. If a school district fails to offer a FAPE, a child may be enrolled in an appropriate private school and the school district may be obligated to reimburse parents for the tuition expenses. 20 U.S.C. § 1412(a)(10)(C)(ii). In Sch. Comm. of Town of Burlington, Mass. v. Dep't of Educ. of Mass., 471 U.S. 359 (1985) and Florence Cty. Sch. Dist. Four v. Carter By & Through Carter, 510 U.S. 7 (1993), the Supreme Court established a three-step analysis to aid a district court in evaluating IDEA tuition reimbursement cases. Under Burlington/Carter, "a district court must first determine if the school district's proposed IEP offers FAPE. Carter, 510 U.S. at 16. If the school district does not offer a FAPE, the court must next determine "whether the parents' unilateral placement of the child at a private school was 'proper.'" Id. Finally, the court should consider whether "equitable considerations are relevant in fashioning relief." Id. (citing Burlington, 471 U.S. at 374).

In examining the first prong of the Burlington/Carter analysis, this Court is guided by the following. Under the IDEA, institutions, including state school districts, that receive federal education funding are required to provide all children with disabilities with a [FAPE]." 20 U.S.C. § 1400(d)(1)(A); 20 U.S.C. § 1412(a)(1)(A). FAPE "includes both 'special education' and 'related services.'" Endrew F. ex rel. Joseph F. v. Douglas Sch. Dist., 137 S. Ct. 988, 994 (2017) (citations omitted). "The IEP is 'the centerpiece of the statute's education delivery system for disabled children.'" Id. (*citing* Honig v. Doe, 484 U.S. 305, 311).

> A comprehensive plan prepared by a child's "IEP Team" (which includes teachers, school officials, and the child's parents), an IEP must be drafted in compliance with a detailed set of procedures. § 1414(d)(1)(B) (internal quotation marks omitted). These procedures emphasize collaboration among parents and educators and require careful consideration of the child's individual circumstances.

> § 1414. The IEP is the means by which special education and related services are "tailored to the unique needs" of a particular child. Rowley, 458 U.S. 176, 181.

Endrew, 137 S. Ct. at 994.

The IDEA "requires that every IEP include 'a statement of the child's present levels of academic achievement and functional performance,' describe 'how the child's disability affects the child's involvement and progress in the general education curriculum,' and set out 'measurable annual goals, including academic and functional goals,' along with a 'description of how the child's progress toward meeting' those goals will be gauged." Id. at 994 (citing 20 U.S.C. § 1414(d)(1)(A)). "An IEP is not a form document. It is constructed only after careful consideration of the child's present levels of achievement, disability, and potential for growth." Endrew, 137 S. Ct. at 999.

"The adequacy of a given IEP turns on the unique circumstances of the child for who it was created." Id. at 1001. It must "set out a plan for pursuing academic and functional advancement." Id. at 999 (citing 20 U.S.C. § 1414(d)(1)(A)(i)(I)-(IV)). In 2017, the Supreme Court rejected the argument that the IDEA requires only that an IEP confer an educational benefit that is "merely more than *de minimus*" and held instead that, "to meet its substantive obligation under the IDEA, a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." Endrew, 137 S. Ct. at 991.[1]

Moreover, the IDEA mandates that eligible students be educated in the "least restrictive environment" (LRE) which permits them to derive meaningful educational benefit. T.R. v. Kingwood Township Board of Education, 205 F.3d 572, 578 (3d Cir. 2000).

---

[1] As the parties correctly point out, this matter was decided before the Supreme Court issued its ruling in Endrew. Nonetheless, this Court will analyze this matter under the Endrew standard as the result is the same.

> To the maximum extent appropriate, children with disabilities, including children in public or private institutions or other care facilities, are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

20 USC § 1412(a)(5)(A).

In Oberti v. Board of Education of Clementon School District, 995 F.2d 1204, 1215 (3d Cir. 1993), the Third Circuit adopted a two-part test for determining whether a student has been placed into the LRE. The first prong of the test requires a determination of whether the child can, with supplementary aids and services, successfully be educated within the regular classroom; and the second prong is that, if placement outside of the regular classroom is necessary, there must be a determination of whether the child has been included with non-exceptional children to the maximum extent possible. Id.

The Hearing Officer made the following factual determinations with respect to the District's proposed IEP.

> The May 2016 IEP stated at its outset that the District members of the IEP team recommended a program focused on functional life skills. This IEP also provided a comprehensive summary of [Juliet's] present levels of academic achievement and present levels of functional performance, including historical information under those sections.
>
> The present levels related to transition similarly provided a comprehensive summary of [Juliet's] transition services and assessments for the then-current and prior school years.
>
> > a. [Juliet's] goal for post-secondary education was noted to be education and/or vocational training after high school; the goal for employment was for competitive employment with support; and the goal for independent living was to gain access to community and family resources and support to be able to live semi-independently following high school graduation.

b. Surveys and inventories completed by [Juliet] and the [Genivivas] in April 2016 reflected [Juliet's] uncertainty about goals for post-secondary education and employment, but desired independent living in a home or apartment. By contrast, the [Genivivas] indicated goals for [Juliet] to live at home or with other relatives; to attend a college campus program, in a "real world and age appropriate setting" focused on vocational and travel training and independent living skills; and to secure competitive employment in the future. They specifically named Program as the setting for [Juliet].

c. Additional transition information from the April 2016 [Reevaluation Report (RR)] and previous school years was also set forth in the IEP.

The May 2016 IEP identified a number of [Juliet's] strengths, including perseverance, work ethic, decoding and oral reading skills, and assignment and task completion. Academic, developmental, and functional needs were noted to improve functional reading, English, and mathematics skills, as well as to improve socialization, vocational, travel, and language skills, in addition to transition services.

The transition section of the May 2016 IEP provided for a number of services, including exploration of programs offered by the local community college; maintenance of a calendar; and job shadowing and other vocational experiences. Functional speech/language, reading, writing, and social skills were also targeted, as were job-readiness skills (mock interviews, application completion, development of a portfolio). Services to address independent living included community based vocational experiences (approximately weekly); community based instruction/field trips (at least twice per quarter); school-based vocational experiences (twice each week) and travel-related instruction and practice.

Annual goals in the May 2016 IEP addressed speech/language, functional academic skills (banking transactions, completion of applications, counting money, identifying safety signs), and social skills. A number of program modifications and items of specially designed [instruction] were also included, as were [Extended School Year (ESY)] services and speech/language therapy services twice per week. The IEP specified a program of supplemental life skills support, with participation in regular education in non-academic (including elective) classes and extracurricular activities.

The District proposed that [Juliet] spend three periods per day in a life skills classroom for direct instruction in English, mathematics, and other areas requiring specially designed instruction.

The District's life skills classroom at the high school has five students ages 16-18. Students work on transition skills based upon their then-current needs in that area. Students in the life skills class have several periods of individual direct instruction working on academic and functional IEP goals, and one or two periods of vocational experiences in the building or out in the community. During the periods of direct instruction, students may be pulled out for related services specified in the IEP. Students also take elective classes in the regular education environment.

Students in the life skills class learn and practice travel and mobility skills, including recognizing and understanding safety signs and navigating crosswalks, in the school building and out in the community. The community-based travel instruction occurs weekly, with the building-level instruction more frequent.

Students in the life skills class are provided weekly instruction on job readiness skills necessary for any job, and continuing through the process of applying for employment. This instruction includes completing job applications, creating resumes, and participating in mock interviews. Students are also assessed for areas of interest for potential employment.

Students' vocational experiences are matched to their interests, and opportunities are individualized for each student based on interests and needs. The IEP team discussed options for Student's vocational experiences consistent with Student's interests at the May 2016 meeting. During vocational periods, the students go out into the community to work with an assigned paraprofessional and sometimes other adults who are working alongside or monitoring the student. Students also participate in vocational experiences at the school building. The students frequently interact with peers during vocational experiences. Data is collected weekly on each student's performance and demonstrated skills at the worksites, and feedback on perfom1ance is provided to the student.

The IEP team discussed increasing the amount of time from the initial recommendation for the frequency of Student's community-based vocational experiences based on Student's performance and needs.

Students in the life skills class participate in community-based field trips, such as to restaurants, based on IEP goals.

The District offers a number of electives in the high school that Student had not yet taken by the end of the 2015-16 school year. There are a number of electives that students take more than once. Many of the elective courses are focused on independent living skills. The District offers a number of clubs for all students in the high school.

The IEP team discussed the possibility of Student spending one period per day in a class of interest to Student as an in-school vocational experience. Student

> would perform tasks such as organizing equipment, taking attendance, and monitoring the students in the class. The team also considered other possibilities for vocational experiences at school based on that particular interest of Student.

(ECF No. 28-1, ¶¶ 26-41) (internal citations omitted).

The record supports the Hearing Officer's factual finding that the District's proposed IEP comports with the technical requirements of the IDEA. 20 U.S.C. § 1414(d)(1)(A). However, satisfaction of the base requirements aside, the Genivivas argue that the Hearing Officer's conclusions are in error. Citing to the testimony of their expert, the Genivivas argue that "learning in a self-contained [classroom] environment … is not appropriate because it does not provide learning experiences in context relevant environments" and "to be effective, Juliet's program should have been 80% to 90% community-based with specific skill attainment goals." (ECF No. 26, pg. 7). The Genivivas then direct this Court to alleged discrepancies between the language of the IEP and the hearing testimony by District representatives specifically with respect to "travel training," and independent living skills. (Id., pg. 15-17).

With respect to travel training, the Hearing Officer determined that "community-based travel instruction occurs weekly, with the building-level instruction more frequent." (ECF No. 28-1, ¶ 34). The proposed IEP recommended that Juliet participate in "Community Based Instruction Field Trips" to places like banks or restaurants eight times per school year and "participate in travel related instruction" in a special education class room one day per week. (Ex. J-10, pg. 40, 41). At the due process hearing, special education life skills teacher Elyse Kuntz testified that her travel training curriculum begins with classroom instruction and gradually moves out into the community. (N.T., 11/16-17/2016, at 176-77). Students participate in community-based travel instruction at least once a week, and are able to do more. (Id. at 178).

The Genivivas argue that Ms. Kuntz's testimony contradicts the IEP's stated eight-times-per-year recommendation, was not shared at the IEP team meeting, and is insufficient to support the Hearing Officer's determination that, under the proposed IEP, Juliet would receive community-based travel training weekly. (ECF No. 26, pg. 15-16). Similarly, the Genivivas contend that the independent living skills instruction outlined in the proposed IEP differs substantially from testimony given by the District's Family and Consumer Sciences teacher, who outlined a number of elective programs available to Juliet that would provide hands-on instruction in cooking, laundry, and cleaning. (Id. at 16). Thus, they challenge the accuracy of the Hearing Officer's finding that the District "offers a number of electives in the high school … focused on independent living" that would be available to Juliet. (Id.) (citation omitted).

Finally, the Genivivas contend that the District's proposed IEP does not comply with the requirement that Juliet be educated in the LRE, arguing that, under the proposal, Juliet would be included with her non-disabled peers for only 60% of her school day. (Id. at 21). Moreover, that time would be spent with younger students whom the Genivivas argue are not Juliet's age-appropriate peers. (Id. at 22).

The District asks this Court to reject the Genivivas' narrow reading of the proposed IEP, noting that the proposal for classroom and community-based instruction with respect to vocational experiences also includes opportunities to practice travel-training in a real-world setting. (ECF No. 23, pg. 10); See Ex. J-10, pg. 40, 41 ("Participate in community based vocational experience to practice vocational and job readiness skills in the community … bank, restaurant sites to fill out applications, sites to respond to internal and external signs (2x each) … minimum of six times per [nine week] quarter…"). Thus, the District alleges that the proposed IEP "specifically provides

for both exposure through instruction and opportunities to practice" travel-related skills in the community, and is not at odds with the testimony presented at the due process hearing. (Id.)

Further, the District maintains that the IEP belies the assertion that the Genivivas were unaware of various regular education life skills electives because Juliet has taken such courses before and the IEP contemplates Juliet's enrollment in elective courses that may be of interest to her, including those that involve laundry or cooking. (ECF No. 23, pg. 12). The District also notes that there was a lengthy discussion at the IEP hearing about identifying vocational experiences that fit within Juliet's interests. (Id. at 13).

Finally, the District argues that the amount of time its proposal has Juliet educated with her non-disabled peers is appropriate. (Id. at 18). The District also notes that neither the LRE analysis nor the IDEA require transition-age students to be educated with same age nondisabled students, nor is there a requirement that transition-age students be educated exclusively on college campuses. (Id. at 15).

This Court's independent review of the record supports the Hearing Officer's determination that the District's proposed IEP provides a FAPE in the LRE. As discussed above, an "IEP is not a form document. It is constructed only after careful consideration of the child's present levels of achievement, disability, and potential for growth," and it must be the result of "careful consideration of the child's individual circumstances." Endrew, 137 S. Ct. at 994, 999. To satisfy the IDEA, an IEP must be "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances," and must offer "'more than *de minimus* progress from year to year...." Id. at 1001. An IEP must include "measurable annual goals, including academic and functional goals, along with a description of how the child's progress toward

meeting those goals will be gauged," and while the "goals may differ, [ ] every child should have the chance to meet challenging objectives." Id. at 994, 1000.

The extensive record herein supports the Hearing Officer's finding that Juliet is a transition-aged student who has demonstrated difficulty generalizing life skills and is in need of "exposure to a variety of authentic settings in order for [her] to learn to use skills independently under different conditions and circumstances." (ECF No. 28-1, pg. 19). In consideration of Juliet's needs, the proposed IEP notes that "[t]he regular education classroom would provide the [LRE] for Juliet; however, due to Juliet's functional level[,] her needs are best met in the life skills classroom[.]" (Ex. J-10, at pg. 55). Further, the IEP notes that modified regular education curriculum in more challenging classes "may not be conducive to Juliet making progress on her identified functional goals." Mindful of these considerations, a plain reading of the District's proposed IEP sets forth measurable, attainable goals specifically designed for Juliet, along with procedures for evaluating her progress. For example, the IEP specifically identifies Juliet as a targeted student for extended school year services; thus, several social and speech/language goals are identified that were to be monitored over the summer. (Id., at pg. 53). The "social" goal required Juliet to attend "weekly community based vocational experiences or [a] school job" and, when approached by an adult involved in that activity, to "communicate effectively by maintaining eye contact, speaking clearly, speaking audibly, responding appropriately to direction, and asking for clarification when needed" with "75% accuracy on 5 consecutive probes." (Id.) It was noted that Juliet's baseline for this goal was "0". (Id.) By contrast, the proposed summer speech-language goals increased the accuracy and frequency percentage to 90 or 100% based on Juliet's higher baseline scores for those activities. (Id. at pg. 53-54).

It very well may be that Juliet will surpass the initial goals set forth in the document, in which case those goals can be revised as provided for in the IEP. However, given Juliet's lack of transition skills to this point, this Court is unconvinced that the proposed IEP was inappropriate for Juliet.

Additionally, this Court is unconvinced by the Genivivas' contention that testimony from the Due Process Hearing differed from the services offered in the proposed IEP or that the testimony was specifically calculated to offer an idealized program in response to the Genivivas' criticisms. (ECF No. 26, pg. 14-15). While the exact range of extracurricular and elective activities was not spelled out in the IEP itself, those services are offered. (See Ex. J-10, at pg. 55, 56).

With respect to the LRE requirement, the proposal provides for Juliet to spend 60% of her school day with similarly-aged peers. Given the emphasis on transition services, as opposed to traditional academics, this Court finds no error in the Hearing Officer's determination that this level of inclusion satisfies the LRE requirement. Further, as the Hearing Officer notes, while the term "peer" is not defined by the IDEA, Pennsylvania's education regulations provide that "[t]he maximum age range in specialized settings shall be … 4 years in secondary school (grades 7--12)" and "[a] student with a disability may not be placed in a class in which the chronological age from the youngest to the oldest student exceeds these limits unless an exception is determined to be appropriate by the IEP team of that student and is justified in the IEP." 22 Pa. Code § 14.146. The record demonstrates that the 16-to-18-year-old non-disabled peers in Juliet's life skills courses would fall within this range.

Accordingly, because the proposed IEP provides Juliet with a FAPE in the LRE, the Genivivas' challenge to the Hearing Officer's decision is without merit. Having determined that

the District offered Juliet a FAPE, this Court needs not proceed to step two of the Burlington/Carter analysis.

**Conclusion**

For the reasons set forth and as more specifically stated herein, this Court will grant the District's motion for judgment on the pleadings and affirm the December 20, 2016 decision of the Hearing Officer. The Genivivas' motion for judgment on the administrative record is denied.

An appropriate order follows.

DATED this 23rd day of May, 2018.

BY THE COURT:

s/ Robert C. Mitchell
ROBERT C. MITCHELL
United States Magistrate Judge

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| JULIET GENIVIVA, by and through her parents and next friends, Albert Geniviva and Janice Geniviva, ALBERT GENIVIVA, and JANICE GENIVIVA,<br><br>Plaintiff,<br><br>vs.<br><br>HAMPTON TOWNSHIP SCHOOL DISTRICT,<br>Defendant. | ) | Civil Action No. 17-351<br><br>Magistrate Judge Robert C. Mitchell |

**<u>ORDER</u>**

AND NOW, to-wit, this 23rd day of May, 2018, for the reasons stated in the Opinion filed contemporaneously herewith, it is hereby ORDERED that

1. the Genivivas' Motion for Judgment on the Administrative Record (ECF No. 25) is DENIED;
2. the District's Motion for Judgment on the Pleadings (ECF No. 22) is GRANTED;
3. the December 20, 2016 decision of the Hearing Officer is AFFIRMED.

/s/ *Robert C. Mitchell*
ROBERT C. MITCHELL
United States Magistrate Judge

Cc: record counsel via CM-ECF